# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
October 29, 2002 Session

## STATE OF TENNESSEE v. DEREK PAUL WHYTSELL

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 236846     Douglas A. Meyer, Judge**

---

**No. E2002-00345-CCA-R3-CD**
**June 18, 2003**

---

A Hamilton County jury convicted the Defendant of DUI and imposed a $500 fine.  The trial court sentenced the Defendant to eleven months and twenty-nine days in the penal farm, which was suspended after service of forty-eight hours.  The trial court further ordered the Defendant to perform fifty days of community service, imposed a fine of $510, revoked his license for a year, and required him to attend DUI school.  The Defendant now appeals, arguing that the trial court abused its discretion in sentencing him.  After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, Derek Paul Whytsell.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; William H. Cox, III, District Attorney General; and Carl T. Huskins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL BACKGROUND

#### A. Trial

Officer Michael McElrath of the Chattanooga Airport Police testified that he was on duty during the early morning hours of January 14, 2000.  He stated that around 3:00 a.m., he was driving down Brainerd Road towards the City of Chattanooga when he noticed a vehicle which appeared to be a Mustang pull out of the parking lot of a nightclub called Flashbacks.  McElrath testified that the car was traveling in the opposite direction that he was driving and was "fishtailing."  He stated that

the car "lost control, fishtailed, looked like he'd overcorrected, came back across and then towards [McElrath] in [McElrath's] fast lane of traffic." McElrath stated that he moved over into the slow lane of traffic so that the driver would have room to regain control of the vehicle. He testified that as he got closer to the vehicle, the driver was "still trying to maintain control, trying to get control." McElrath stated that as the vehicle "came over to the slow lane," McElrath "got up onto the side area of the bridge, curb area to try to avoid . . . being . . . struck head on by this car." He noted that the vehicle came within five feet of striking his patrol car.

McElrath testified that the vehicle passed him, so he turned around to follow the vehicle. He stated that he followed the car, a red Ford Mustang, but did not turn on his blue lights because he "wanted to see what was wrong with the vehicle." McElrath stated that the vehicle drove to Yee's Crabhouse, pulled into the parking lot, and turned around. He testified that the vehicle then proceeded in the same direction from which it had just come. McElrath stated that he then turned on his blue lights. He recalled that the vehicle was driving with a "noticeable swerve, a weave." McElrath testified that he pulled the vehicle over for reckless driving.

McElrath identified the Defendant in court as the driver of the vehicle. After stopping the vehicle, McElrath asked the Defendant to step out of the car because he "notice[d] a very strong smell of an alcoholic beverage." He also noticed that there was "a slight slur to [the Defendant's] speech." McElrath gave the Defendant two field sobriety tests: the walk-and-turn and the one-legged stand. He noted that the Defendant performed both tests poorly. He stated that during the walk-and-turn test, the Defendant did not keep his balance, did not follow instructions, did not consistently walk "heel to toe," and stepped off of the line on which he was walking. McElrath stated that during the one-legged stand test, "[t]here was a noticeable swaying . . . where [the Defendant] was again trying to keep his balance without raising his arms." He also testified that the Defendant "hopped" to maintain his balance and put his foot down during the test.

McElrath placed the Defendant under arrest. He stated that prior to the arrest, he asked the Defendant if he had had anything to drink that night. According to McElrath, the Defendant said that he had drunk two beers that night. He stated that after he placed the Defendant under arrest, the Defendant became "more aggressive, verbally abusive and very demanding." McElrath testified that the Defendant refused to take the blood alcohol test and refused to sign the implied consent form. He stated that the Defendant remained verbally abusive at the jail and later threatened him.

The Defendant testified that he was twenty-nine years old at the time of trial and that he was twenty-eight years old at the time of the offense. He stated that he moved to Chattanooga in 1987. The Defendant reported that he graduated from high school with honors, and then he went to Chattanooga State for roughly four and a half years where he graduated with an associate's degree in nutrition and exercise science. The Defendant testified that he had worked in the restaurant industry since he was sixteen years old. He stated that at the time of trial, he was working as a server at Outback Steakhouse and as the "front desk man" at Homewood Suites Hilton. He further stated that he had just been hired at Erlanger Hospital as a dietician tech. The Defendant testified that he was a year away from graduating with a bachelor's degree in exercise science.

The Defendant testified that there were many occasions when he worked as a bartender that he refused to serve alcohol to someone because the person appeared intoxicated. He stated that he knew his own limitations and that he carried the number of a taxi service in his wallet in case he has had too much to drink and needs a ride. The Defendant testified that he did not believe that he was too impaired to drive a vehicle on the night that he was stopped by Officer McElrath. He maintained that he was stopped much earlier than 3:00 a.m. He testified that he left work at the Texas Roadhouse around 6:00 p.m. on the previous day. The Defendant recalled that after going home, he met a friend around 9:30 p.m. at the Peking restaurant, parked his car, and rode with his friend to Red Lobster to eat.

According to the Defendant, after dinner, he and his friend went to Big River Restaurant in downtown Chattanooga to see if any good bands were playing that evening. The two then walked to Taco Mac. Realizing that they were on a time schedule to meet the friend's girlfriend, they then went to Flashbacks. The Defendant testified that his friend parked next to his car in the Peking restaurant parking lot. The Defendant maintained that he only had one drink and then left around 1:00 or 1:15 a.m. He acknowledged that he drank mixed drinks during the evening and estimated that he consumed about three ounces of alcohol. The Defendant believed that Officer McElrath was mistaken about seeing his car fishtail or that the car that McElrath saw come out of Flashbacks was not his car. He testified that Officer McElrath pulled him over within 200 feet of the parking lot where he had been parked. He maintained that he never threatened Officer McElrath. The Defendant testified that he would have taken the breathalyzer test, but he felt threatened by one of the officers at the police station.

## B. Sentencing Hearing

The State did not present any proof at the sentencing hearing and relied on evidence presented at the Defendant's trial. The Defendant testified that he is a homeowner. He stated that at the time of the sentencing hearing, he was working at three different places: Erlanger Hospital, Outback Steakhouse, and Homewood Suites Hilton. The Defendant testified that he had one year remaining in school and that he intended to apply for medical school when he finished. He stated that this was the first time he had ever been arrested. The Defendant maintained that he never threatened Officer McElrath.

Fred Whytsell, the Defendant's father, testified that the Defendant has two brothers and that the Defendant is the middle child. He stated that he was very proud of his son. He testified that the Defendant put himself through college. Whytsell reported that his son never got into any trouble when he was younger and that he is an "upright citizen." He stated that his son is not a violent person. Whytsell acknowledged that he had never seen the Defendant when he was drunk.

Randy M. Hayes testified that he had worked with the Defendant for the past four months and that he also socialized with the Defendant. He stated that the Defendant is "an honorable man." Hayes acknowledged that he was not with the Defendant on the night of the offense.

## II. ANALYSIS

The Defendant argues that the trial court imposed an excessive sentence. Specifically, he argues that the trial court abused its discretion by ordering that he perform fifty days of public works. In misdemeanor sentencing, a separate sentencing hearing is not mandatory, but the trial court is required to allow the parties a reasonable opportunity to be heard on the question of the manner in which the sentence is to be served. Tenn. Code Ann. § 40-35-302(a). In this case, the trial court did so. Further, the sentence imposed must be specific and consistent with the purposes and principles of the Criminal Sentencing Reform Act of 1989. Id. § 40-35-302(b). A percentage of not greater than seventy-five percent of the sentence should be fixed for service, after which the Defendant becomes eligible for "work release, furlough, trusty status and related rehabilitative programs." Id. § 40-35-302(d). Our supreme court has noted that trial courts have more flexibility in misdemeanor sentencing that in felony sentencing. See State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998).

The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). However, in determining the percentage of the sentence to be served in actual confinement, the court must consider enhancement and mitigating factors as well as the purposes and principles of the Criminal Sentencing Reform Act of 1989, and the court should not impose such percentages arbitrarily. Tenn. Code Ann. § 40-35-302(d).

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Id. § 40-35-401(d). The Tennessee Supreme Court has held that in misdemeanor sentencing a trial court is not required to place specific findings on the record. Troutman, 979 S.W.2d at 274. A trial court need only consider the principles of sentencing and the enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute. Id. In this case, to determine the manner of service of the sentences, the trial court considered appropriate enhancement and mitigating factors and the principles of sentencing. Therefore, our review in this case is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, the trial court sentenced the Defendant to eleven months and twenty-nine days, which was suspended after forty-eight hours incarceration. In addition, the trial court ordered the

Defendant to perform fifty days of community service. At the conclusion of the sentencing hearing, the trial court observed:

> I think he's a fine young man. He is to be admired for his achievements, putting himself through school, working these three different jobs and . . . he is an honorable man, but he did not tell the truth during this trial.

Relying on Tennessee Code Annotated § 40-35-103(1), the Defendant states that he had no prior criminal record. See Tenn. Code Ann. § 40-35-103(1)(A). He also points out that no argument was made that community service was needed to avoid depreciating the seriousness of the offense or that community service was necessary to provide deterrence for others. See id. § 40-35-103(1)(B). We conclude that the Defendant's reliance on Tennessee Code Annotated § 40-35-103(1) is misplaced. That statute specifically provides that those considerations be made when determining whether an offender be incarcerated. The Defendant contends that although community service is not strictly confinement, "it is still a restraint on the Defendant's liberty." However, we conclude that the trial court properly ordered the Defendant to perform fifty days of community service. The Tennessee Supreme Court has held that a defendant's lack of candor or untruthfulness reflects poorly on a defendant's potential for rehabilitation. See State v. Neeley, 678 S.W.2d 48, 49 (Tenn. 1984); see also State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996).

The Defendant further argues that although the trial court stated that it based the community service requirement on the Defendant's failure to tell the truth, it was actually punishing the Defendant for exercising his right to a jury trial. The Defendant points out that at the beginning of the Defendant's trial, the Court addressed the Defendant's counsel as follows:

> THE COURT: Mr. Levitt, does your client realize that the State, I . . . assume the State's offered the same thing he received downstairs?
> MR. LEVITT: Yes, sir.
> THE COURT: A $360 fine and 48 hours active time, which is the minimum.
> MR. LEVITT: Yes, sir.
> THE COURT: Does your client realize if he goes to trial and is convicted, all likelihood is he will receive more time?
> MR. LEVITT: I don't know if he realizes in all likelihood he would. He realizes there's a possibility of that, Judge, yes, sir.
> THE COURT: Okay. Because, see, that is the minimum and the State offers the minimum because he accepts responsibility for his action and spares the State the trouble and expense of trial. So a lot - -
> MR. LEVITT: I think that works both ways, Judge.
> THE COURT: So the odds, the odds are great he . . . would not receive the same sentence.

We find this argument unpersuasive. The trial court was merely informing the Defendant that if he went to trial, he could potentially receive more time than was offered by the State in exchange for a plea of guilty. In addition, we note that the Defendant's testimony directly contradicted some portions of Officer McElrath's testimony. It is apparent from the jury's verdict that the jury found

Officer McElrath more credible.  The trial court heard the testimony of the Defendant at trial and observed his demeanor.  In our view, the trial court did not err by determining that the Defendant was untruthful.  This issue is without merit.

Because we conclude that the trial court did not err in sentencing the Defendant, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE